**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                    :

In re                               :  Chapter 11
                                      :  Case No. 07-22707 (RDD)

CAVALRY CONSTRUCTION, INC.,        :
                                      :

                                      :

                 Debtor.               :
-------------------------------------------------------------------x
                                      :

CAVALRY CONSTRUCTION, INC.         :
                                      :

                 Plaintiff,           :

                                      :

                 v.                  :  Adv. Pro. No. 07-08318(RDD)

                                      :

WDF, INC., <u>et al.</u>                   :

                                      :

               Defendants.         :
-------------------------------------------------------------------x

## <u>POST-TRIAL MEMORANDUM OF DECISION</u>

Appearances:  Welby, Brady & Greenblatt, LLP, by John J. P. Krol, Esq., for plaintiff, Cavalry
                Construction, Inc.

                Robert D. Saville, Esq., for defendant WDF, Inc.

Hon. Robert D. Drain, United States Bankruptcy Judge

       It is well established that a complaint need not state any legal theory justifying the relief

sought; rather, it requires sufficient factual averments to show a plausible claim for relief. 2

JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, § 8.04[3] (3d. ed. 2011); <u>Newman v.</u>

<u>Silver</u>, 713 F.2d 14, 15, n.1 (2d Cir. 1983). A plaintiff's options narrow, however, as it proceeds

through trial, based on the choices it makes in presenting its case. The resolution of this dispute

highlights the need to establish relief under the correct legal theory, or, more aptly, the risk

inherent in presenting one's case narrowly to fit a theory that proves to be flawed while failing to

establish, or omitting to prove facts that perhaps might establish, liability under another theory.

Here, it is clear that plaintiff, Cavalry Construction Inc. ("CCI") performed work for which it is

owed a substantial sum.  Unfortunately for CCI, it has on three occasions sought to recover from

defendant WDF, Inc. ("WDF") on a theory that did not entitle it to such relief based on a record

that also did not fairly support relief that might perhaps be granted on other theories. This

memorandum of decision sets forth the Court's findings and conclusions supporting the denial,

for the third and last time, of CCI's claim against WDF.

## Jurisdiction

The Court has "related to" jurisdiction over this proceeding pursuant to 28 U.S.C.

§§ 157(a) and (b) and 1334(b).  This proceeding to establish a claim that constitutes one of the

largest, if not the largest, assets of the estate is a core proceeding under 28 U.S.C. §

157(b)(2)(O), and, after being alerted by both the District Court and this Court to the potential

applicability of Stern v. Marshall, 131 S. Ct. 2594 (2011), both sides have waived their right to

object to the Court's power to enter a final order on the merits.

## Procedural History

**1.  The first trial and reversal**

After a lengthy trial, by order and judgment dated April 24, 2009 the Court (Hardin, J.)

awarded damages to CCI against WDF of $853,165.75, plus post-judgment interest, for CCI's

masonry and related work performed in the construction, ultimately on behalf of the New York

City School Construction Authority (the "SCA"), of the Bronx School for Law (the "Bronx Law

Project").  That decision was reversed and remanded by Cavalry Constr., Inc. v. WDF, Inc. (In re

Cavalry Constr., Inc.), 428 B.R. 25 (S.D.N.Y. 2010), aff'd in respect of other claims, 425 Fed.

Appx. 70 (2d Cir. 2011), in which the District Court (Karas, J.) concluded that CCI and Judge

Hardin had premised CCI's claim against WDF on a wrong that CCI did not have standing to

assert. More specifically, the District Court concluded that CCI alleged, and Judge Hardin found,

that WDF breached a fiduciary duty to a joint venture between WDF and CCI (the "JV") and not

a duty running directly from WDF to CCI, and, therefore, that CCI had not pursued a direct

claim against WDF that could give rise to the judgment. Id. at 34-37.[1]

CCI's problem with standing stemmed from the fact that the parties structured their

relationship on the Bronx Law Project as follows: (1) WDF -- which had a subcontract on the

project with the prime contractor, Silverite Construction Co, Inc. ("Silverite") for three trades,

including masonry work -- entered into a written joint venture agreement (the "JV Agreement")

with CCI to create the JV, and (2) the JV Agreement provided that WDF and the JV would enter

into a second-tier subcontract pursuant to which the JV would provide the masonry work to

WDF (the "JV Masonry Contract"), which would be performed by CCI.[2] Id. at 25.  Thus, CCI

did not allege before Judge Hardin that WDF breached a masonry contract with it; it could not do

so, not being in privity with WDF for such work and New York law[3] being clear that a

subcontractor generally may not assert a cause of action to recover damages for breach of

contract against a party with whom it is not in privity.  Id. at 30 (internal citations and quotations

omitted); see also IMS Engineers-Architects, P.C. v. State of New York, 858 N.Y.S.2d 486, 488

(App. Div. 3d Dep't 2008), lv. denied, 11 N.Y.3d 706 (2008) ("Under settled principles, a

[1] CCI had not brought, and since then has never brought or tried to prove, a derivative claim
against WDF on behalf of the JV; nor had it, or has it, asserted a breach of a fiduciary duty, such
as a duty of care or loyalty, running directly from WDF to CCI in its capacity as joint venturer in
the JV, and not surprisingly Judge Hardin did not base his ruling on such theories.

[2] This differed from the parties' normal relationship over the course of many other projects
where WDF subcontracted directly with CCI to provide masonry work without an intermediate
joint venture.  Id. at 25.

[3] New York law governs this dispute, as the parties agree.

subcontractor may not assert a cause of action which is contractual in nature against parties with whom it is not in privity.") (internal quotations omitted).

Instead, CCI alleged a breach of fiduciary duty by WDF to the JV for not collecting from Silverite and passing on to the JV the full amount owing on the JV Masonry Contract. In re Cavalry Constr., Inc., 428 B.R. at 31-32 (noting that CCI had argued and Judge Hardin had found that CCI's right to payment arose under the JV Agreement, for breach of fiduciary duty).[4] And, as noted, the District Court concluded that because this fiduciary duty ran from WDF to the JV, not from WDF to CCI, CCI did not have standing and the Bankruptcy Court's order should be reversed. Id. at 36-37.

### 2.  The second trial

The District Court did not simply dismiss CCI's claims, however, "because it appear[ed] possible that, if it had addressed the question, the Bankruptcy Court could have found that a privity-like relationship existed between WDF, as subcontractor, and [CCI], as third-tier subcontractor." Id. at 37. It is clear that the District Court was referring to the New York doctrine of the "functional equivalent of privity," which it had discussed earlier in the opinion. Id. at 30-31. The District Court did not limit the issues that CCI could address on remand to this doctrine, though:

> It is important to note some subjects on which the Court has *not* rendered any opinion. The Court expresses no opinion as to whether the [JV] would be entitled to collect the monies that form the basis of [CCI's] claim against WDF in this appeal. The Court also expresses no opinion as to whether [CCI] is entitled to recover based on a derivative action on behalf of the [JV] against WDF, or on whether [CCI] is entitled to recovery

---

[4] As acknowledged by counsel for WDF during the second trial in this adversary proceeding, it is logical to assume that Judge Hardin found that the only remaining amounts owing under the JV Masonry Contract were unpaid profits, because in awarding damages of $853,165.75 to CCI the Court halved the amount owed to the JV under the Masonry Contract and the JV Agreement provided that the JV partners (WDF and CCI) would share the profits of the JV, 50/50. See February 8, 2011 Trial Transcript ("Tr. II") at 92-93, 109-10.

based on a direct action, as third-tier subcontractor, against the [JV]. Likewise, the Court does not decide the question whether the functional equivalent of privity existed between WDF, as subcontractor, and [CCI], as third-tier subcontractor, since that is an issue, at least initially, for the trial court. Finally, the Court offers no opinion on whether Cavalry's pleadings are sufficient to allow it to pursue these alternative theories of liability or, if Cavalry's pleadings are insufficient, on any issue regarding amending the complaint or the statute of limitations.

Id. at 38, n.9 (emphasis in original; internal citations omitted).

On remand, CCI contended (having amended its complaint under Fed. R. Bankr. P. 7015) that New York's "functional equivalent of privity" doctrine applied.[5]

As noted by Judge Karas, "The determination of whether the 'functional equivalent of privity' exists . . . is a highly fact-dependent endeavor which must consider the de facto dealings between the relevant parties as well as the language of the relevant contracts." Id. at 31. It is a narrow exception to the rule that only parties in contractual privity can claim a breach of contract, Ossining Union Free School Dist. v. Anderson, 73 N.Y.2d 417, 424-25 (1989), and has developed in New York in two contexts, although the courts seem not to expressly recognize that the factors establishing liability, or the balance of such factors, under the doctrine might differ depending on which context applies.

First, it is well established that one not in privity with another may have a claim for negligence against such party if (1) the parties were aware that the defendant's work was to be used for a particular purpose or purposes of the plaintiff, (2) there was reliance by the plaintiff on such work in furtherance of such purpose, and (3) there was some conduct by the defendant linking it to the plaintiff and evincing defendant's understanding of plaintiff's reliance. Id. at 424. See also City Sch. Dist. of Newburgh v. Hugh Stubbins & Assocs., 85 N.Y.2d 535, 538-39

---

[5] Shortly before the second trial, CCI also alleged the breach of a direct oral contract between WDF and CCI, Tr. II at 6, but the Court did not permit it to do so because of the prejudice to WDF from CCI failing to make this allegation in the second amended complaint or thereafter until the eve of trial. Id. at 17.

(1995) (doctrine applied to negligence claim against subcontractor where (a) the prime contractor undertook construction on behalf of the plaintiff, which all parties knew when the contracts were negotiated, (b) plaintiff was the intended beneficiary of the contract, and (c) plaintiff directly reviewed and approved third-tier defendant's work, retained control of the budget and change orders and had a representative at the construction site on a daily basis); RLI Ins. Co. v. King Sha Grp., 598 F. Supp. 2d 438, 443-44 (S.D.N.Y. 2009). Indeed, it has been stated, in dicta, that the doctrine is limited to negligence claims. Travelers Cas. & Sur. Co. v. Dormitory Auth., 734 F. Supp. 2d 368, 382 n.21 (S.D.N.Y. 2010); see also Hamlet at Willow Creek Dev. Co. v. Northeast. Land Dev. Corp., 878 N.Y.S.2d 97, 112 (App. Div. 2d Dep't 2009) (limiting doctrine to negligent misrepresentation claims).

On the other hand, several cases have applied the doctrine to *breach of contract* claims. See, e.g., Brownell Steel, Inc. v. Great Am. Ins. Co., 813 N.Y.S.2d 550, 551 (App. Div. 3d Dep't 2006) (functional equivalent of privity existed between contractor and second-tier subcontractor when second-tier subcontract (a) identified contractor as intended beneficiary for whom second-tier construction work was to be done, (b) incorporated the terms of the contractor/first-tier subcontractor contract, and (c) provided that second-tier subcontractor was to assume all responsibilities of first-tier subcontractor on first-tier contract); Robert H. Finke & Sons, Inc. v. Sears Oil Co., 681 N.Y.S.2d 829, 830 (App. Div. 3d Dep't 1998) (sufficient evidence of functional equivalent of privity to defeat summary judgment where subcontractor dealt directly with owner, to whom equipment and invoices were delivered); AMEC Constr. Mgt., Inc. v. City of New York, 2012 N.Y. Misc. LEXIS 130, at *5-6 (Sup. Ct. N.Y. Cty. Jan. 10, 2012) (functional equivalent of privity applied where owner had promised to pay for subcontractor's

services); <u>Keywell L.L.C. v. Pavilion Bldg. Installation Sys.</u>, 861 F. Supp. 2d 120, 129

(W.D.N.Y. 2012):

> New York law does recognize that, even in the absence of a formal signed
> contract, the 'functional equivalent of privity' may exist in construction situations
> under certain circumstances when a project's owner and subcontractor engage in
> direct dealings.  Such circumstances include, *inter alia*, (1) where the prime
> contract provided that the subcontractor would assume all obligations and
> responsibilities of the contractor; (2) the project owner and subcontractor had
> direct dealings such that the subcontractor knew the work being performed was
> for the benefit of the intended beneficiary of the agreement between the general
> contractor and the subcontractor; (3) the project owner assumed payment
> obligations toward the subcontractor, and (4) the project owner is the foreseeable
> and intended beneficiary of the agreement between the general contractor and the
> contractor.

(internal quotations and citations omitted).  <u>See also</u> <u>Kapsis v. Am. Home Mortg. Servicing Inc.</u>,

923 F. Supp. 2d 430, 451-52 (E.D.N.Y. 2013); <u>Aktas v. JMC Dev. Co.</u>, 877 F. Supp. 2d 1, 27

(S.D.N.Y. 2012) (contract claim by owner against subcontractor survives summary judgment

where subcontractor was retained on behalf of owner and prepared work for owner).  In these

cases, the doctrine appears to overlap more closely with third-party beneficiary law or agency

principles than in the negligence context, or, as in the <u>Keywell</u> and <u>Aktas</u> cases, <u>supra</u>, the facts

also involved the subcontractor's negligence to the owner.

   In any event, in its second amended complaint and at the second trial CCI charted a

flawed and ultimately unsuccessful path to establishing the applicability of the "functional

equivalent of privity" doctrine, because (a) it continued to assert that the applicable breach was a

breach of the JV Agreement, as opposed to a breach of the JV Masonry Contract after CCI's

performance thereof, and (b) it did not introduce sufficient evidence of the parties' dealings with

respect to the JV Masonry Subcontract and CCI's performance thereof to establish the functional

equivalent of privity between WDF and CCI regarding CCI's performance of the masonry work.

To be more accurate, CCI did prevail before *this* Court at the second trial, the Court having found that, notwithstanding CCI's characterization of its case, CCI had introduced sufficient evidence in light of (a) the shell status of the JV, (b) the overlapping nature of the JV Masonry Contract and CCI's performance thereof, (c) the de facto performance by WDF and CCI under the JV Masonry Contract as if WDF were subcontracting the work directly to CCI, and (d) the interaction of CCI with WDF and Silverite in the performance of the masonry work to establish the functional equivalent of privity between WDF and CCI under New York law. See Tr. II at 79-80, 87-89, 121-133. However, on appeal the District Court (Karas, J.) reversed, concluding that WDF was unfairly prejudiced for purposes of Fed. R. Bankr. P. 7015 by the fact that this Court, at trial, reconfigured CCI's theory (which, again, was premised on a breach of the JV Agreement, not of the JV Masonry Contract after CCI's performance thereof) to reach its result. See January 19, 2012 Transcript ("Bench Ruling") at 50-61. Instead, the District Court concluded, WDF should have been entitled to develop a defense, with appropriate notice, discovery and the time to prepare for trial, to a functional equivalent of privity argument premised not on the JV Agreement but, rather, on the JV Masonry Contract and/or the parties' performance and understandings. Bench Ruling at 55-56.[6]

In addition, or relatedly, there was insufficient evidence of the JV Masonry Contract and the parties' performance to support a judgment based either on the functional equivalent of privity or a third-party beneficiary theory. Bench Ruling at 60; see also id. at 47 ("I don't see, whether it's a functional equivalent [of privity] analysis or a third-party beneficiary analysis, it

---

[6] The Court admits having a Galileo-like reaction ("And yet … it moves.") to some decisions reversing its rulings, but not to this one. In any event, it is the law of the case. Christianson v. Colt. Indus. Operating Corp., 486 U.S. 800, 815-16 (1988) ("[T]he doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (internal quotations and citation omitted); In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991).

has to state what the terms of the contract are, and there's no evidence in the record as to what those terms are.").

The District Court remanded to this Court again, however, to permit CCI to amend its complaint to pursue a theory or theories of liability -- whether premised on the functional equivalent of privity, third-party beneficiary status or even, as CCI had belatedly alleged before the start of the second trial, a direct contract between WDF and CCI -- grounded in the JV Masonry Contract and/or any third-tier CCI masonry contract (to the extent they could be shown). Id. at 60-61.

### 3. The third trial

On remand, for reasons that have not been expressed and may have been good, CCI did not take up each of the possible approaches left open by the District Court and this Court. Instead, it filed a third amended complaint, with WDF's consent [Doc. 143], in which it contended that *there really was no intervening JV Masonry Contract* but simply a direct masonry subcontract between WDF and CCI, which WDF breached.  Third Amended Complaint at ¶ 57;[7]

---

[7] The Third Amended Complaint also asserted causes of action against WDF for breach of an implied contract and an implied contract of good faith and fair dealing with CCI and for unjust enrichment.  Third Amended Complaint ¶¶ 71-92.  However, the Court had previously held that CCI's claim for unjust enrichment (or similar quasi-contract theories) was precluded by the existence of a contract or contracts governing the subject matter at issue, the JV Agreement and the JV Masonry Contract, Tr. II at 124, and that ruling still applies. See Pappas v. Tzolis, 20 N.Y.3d 228, 234 (2012); Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 388-89 (1987); Andrew R. Mancini Assoc., Inc. v. Mary Imogene Bassett Hosp., 914 N.Y.S.2d 449, 452 (App. Div. 3d Dep't 2011) ("[G]iven that plaintiff failed to specifically articulate any work performed outside the scope of the subcontract for which it has not been paid, its claims for unjust enrichment and quantum meruit also fail.") (citations omitted); IMS Engineers-Architects, P.C. v. State of New York, 858 N.Y.S.2d 486, 489 (App. Div. 3d Dep't 2008), lv. denied, 11 N.Y.3d 706 (2008). The claims for breach of an implied contract and an implied contract of good faith and fair dealing, to the extent they are not quasi-contract claims governed by the foregoing authority, are properly viewed as breach of contract claims and, therefore, a subset of the Third Amended Complaint's breach of contract claim; they succeed or fail as that claim succeeds or fails. National Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) ("In

see also Trial Declaration of Kerry Timmons, dated September 26, 2012 ("Timmons Decl.") at ¶

6 ("WDF then further directly subcontracted with [CCI] for certain trade work, including

masonry work, on Bronx Law.").  CCI also asserted at trial that the JV was not a proper joint

venture and thus void from the start, and, therefore, that the contractual chain should be

collapsed to one in which WDF and CCI were in direct privity.  See also Timmons Decl. at ¶ 19

("The [JV] . . . was not a functioning joint venture."), ¶ 21 ("The [JV] was never intended by the

parties to function and, in reality, it did not work on the Bronx Law Project."), and ¶ 29 ("In

reality, the actual contractual chain is as follows:  (1) SCA to Silverite, pursuant to a written

prime contact, (2) Silverite to WDF, pursuant to a written, first-tier subcontract; and (3) WDF to

[CCI], pursuant to an oral, second-tier subcontract.  The [JV] simply put was an empty shell.").

These contentions are addressed below.

### The Court's Findings and Conclusions Based on the Third Trial Record

Based on the evidence admitted at the third trial, including the testimony[8] of Kerry

Timmons, President of CCI; Lawrence P. Roman, President and CEO of WDF; and John

Stacom, formerly Senior Vice President of WDF and WDF's primary representative on the

Bronx Law Project, the Court makes the following findings.

**A.    The parties were governed by the JV Agreement; there was no oral**

**WDF/CCI subcontract.**  In early June 2002 WDF sought to retain CCI as its subcontractor for

---

New York, breach of the implied duty of good faith and fair dealing is merely a breach of the
underlying contract.") (internal quotations and citations omitted); see also Boccardi Capital Sys.
v. D.E. Shaw Laminar Portfolios, L.L.C., 355 Fed. Appx. 516, 519 (2d Cir. 2009) ("Our
conclusion that Boccardi has failed sufficiently to allege a breach of contract compels a similar
conclusion respecting its claim, grounded in the same factual predicate, for breach of the implied
duty of good faith and fair dealing.").

[8] The Court took direct testimony by witness affidavit or declaration, subject to live cross
examination and redirect.

the masonry work on the Bronx Law Project, as it had on numerous other projects.  A hitch

ensued, however.  Concerned about CCI's financial resources to perform the work, which was

CCI's largest project to date, the SCA refused to let CCI enter into the second-tier subcontract

with WDF.  October 19, 2012 Trial Transcript ("Tr. III") at 19, 94-96; Witness Affidavit of John

Stacom, dated October 11, 2012 ("Stacom Aff.") at ¶ 5; Witness Affidavit of Lawrence P.

Roman, dated October 12, 2012 ("Roman Aff.") at ¶ 6.  In fact, the SCA's concern appeared to

be well founded:  because of CCI's possible inability to fund the expenditure, WDF and CCI had

already agreed that WDF would advance CCI's costs, exclusive of overhead and compensation

for CCI's two principals, and, in return, CCI had agreed with WDF to split the profits that CCI

would have made for the masonry work on a 50/50 basis with WDF. Tr. III at 70-74, 108-09,

116.

To appease the SCA, WDF and CCI agreed to form the JV, which would be the second-

tier subcontracting party on the Bronx Law Project with WDF instead of CCI.  Id. at 19, 96-9;

Stacom Aff. ¶¶ at 6-7; Roman Aff. at ¶¶ 6-7.  They did so pursuant to the JV Agreement, dated

June 26, 2002.  The JV Agreement (a) recites the parties' desire to perform the masonry

subcontract as joint venturers, through the JV, "upon the terms and conditions to be set forth in a

written agreement (the 'Subcontract')," JV Agreement p.1, and (b) provides that the masonry

Subcontract "shall be entered into and executed by [WDF] and [CCI], A Joint Venture (the

'[JV]') and the services required under the Subcontract shall be performed in the name of the

[JV]."  Id. ¶ 1.1(a).

The parties agreed that the "[JV] Agreement supersedes any and all prior agreements

between the parties hereto with respect to the aforesaid Subcontract."  Id. ¶ 1.1(c).  The life of

the JV was to be coterminus with the Subcontract, id. ¶ 1.6, the performance of which was the JV's sole purpose.  Id. ¶ 1.1(a).

WDF was designated the managing joint venturer under the JV Agreement, responsible in that capacity for making all decisions pertaining to the performance of the Bronx Law Project, id. ¶ 5.2, while it was agreed that CCI "shall perform all work, labor and services, and supply all tools and equipment and perform all related work in connection with the performance of all masonry and related work as set forth in the scope of work annexed as Exhibit 'A.'  CCI shall assume primary day-to-day responsibility to administer, manage and perform all masonry related functions in the Subcontract."  Id. ¶ 5.5.

Notwithstanding the parties' agreements on page 1 and in ¶ 1.1(a) of the JV Agreement, there never was a written Subcontract between WDF and the JV for the performance of the masonry work on the Bronx Law Project, however.  Roman Aff. at ¶ 7.  Thus, there was no written JV Masonry Contract, although the parties performed, nonetheless.  Id.  Nor was there a written third-tier masonry contract between the JV and CCI, Tr. III at 108-10; Stacom Aff. at ¶ 14; Roman Aff. at ¶ 18, although it is not apparent, notwithstanding the parties' and the courts' discussion earlier in this litigation of a third-tier subcontract between the JV and CCI, that the parties ever intended that there would be such a contract, as opposed to CCI's agreement, in ¶ 5.5 of the JV Agreement, to perform essentially all of the services that the JV was to perform under the JV Masonry Contract that was never reduced to a writing.  Certainly WDF takes the position that no third-tier CCI masonry contract was intended.  Stacom Aff. at ¶ 14; Roman Aff. at ¶ 18.

It was not unusual, though, for CCI to perform substantial work for WDF -- particularly start-up work, change orders, or additional work -- without a written contract, at least for a limited time. Tr. III at 89-91.  The parties had worked closely, without incident, on many jobs

12

together, including on jobs where a substantial amount of work was done without a written contract, and trusted each other.  Tr. III at 89-90.  On the Bronx Law Project, CCI proceeded to perform the masonry work, ostensibly under the rubric of the JV, including change orders and additional work, and WDF found its work to be complete and acceptable.  Id. at 99-100.

CCI was not paid, however, as it had been paid in prior jobs.  Instead, it was paid consistent with the provisions of the JV Agreement concerning the joint venturers' rights and obligations.  Tr. III at 67, 108; Stacom Aff. at ¶¶ 11-13.  Under the JV Agreement, WDF and CCI, as joint venturers, agreed to share the profits and losses of the Subcontract, and all property acquired in connection with its performance, on a 50/50 basis.  JV Agreement ¶ 3.1.  The parties had the right, but not the obligation, to make capital contributions to the JV, id. ¶¶ 4.4 (initial capital contributions), 4.5 (contributions for working capital), although none are claimed to have been made.  It was also agreed that "[i]n the event there are insufficient funds in the [JV] bank account to reimburse CCI for [its weekly payroll costs actually incurred for the Project, together with other direct labor costs (including employee payroll taxes and union benefits)], WDF shall advance sufficient funds to the [JV] to cover these expenses which advances shall be . . . reimbursed to WDF from [JV] revenues."  Id. ¶ 5.51.  In addition, WDF was to do "all the purchasing for the [JV], arrange for the preparation and execution of further subcontracts, if necessary, track and process shop drawings and submissions, and shall prepare and submit requisitions for the [JV].  Id. ¶ 5.6.

In fact, WDF paid the JV's expenses, or "Cost of Construction" (which, under ¶¶ 3.2 and 3.3 of the JV Agreement, did not include each joint venturer's management and administrative time on the Bronx Law Project, similar home office overhead, and preliminary expenses incurred in connection with the proposal and award of the Subcontract).  Tr. III at 86-86.  In addition, Mr.

Timmons acknowledged that WDF advanced a portion ($215,000) of CCI's 50% share of profits under the JV Agreement, which provides in ¶ 4.5 for such interim distributions out of surplus. Tr. III at 84; see also id. at 48; Stacom Aff. at ¶ 13.  Thus, contrary to the parties' normal payment terms, but consistent with the JV Agreement, on the Bronx Law Project (a) WDF did not require a payment or performance bond for the masonry work, (b) WDF had the right to approve in advance all material purchases or Costs of Construction incurred, (c) there was no retainage withheld by WDF from the payments to CCI, (d) WDF paid the Costs of Construction generally without itself having received payments for such items from Silverite, and (e) except for the $215,000 payment referred to above, CCI was paid no overhead or profit on an interim basis.  Stacom Aff. at ¶ 17; Tr. III at 82-85.

Critically, the JV Agreement does not provide for any rights by CCI against either Silverite or WDF other than against WDF on a limited basis through the JV, as discussed above.[9] Nor does the JV Agreement expressly make CCI a third-party beneficiary of the JV Masonry Agreement.  Instead, the JV Agreement states, "No Third Party Benefit.  No provisions of this Agreement shall be deemed to benefit or confer any right upon a third party," JV Agreement ¶ 12.3, which WDF contends expressly waives CCI's right to assert that it is a third-party beneficiary of the JV Masonry Contract.  If one accepts that CCI is a party to the JV Agreement solely in its capacity as a joint venturer, WDF's contention seems apt:  in any other capacity, CCI would be a third party to the JV Agreement, and, therefore, expressly precluded from relying on it in such capacity to confer any right on it.

---

[9] Article 6 of the JV Agreement governs the parties' rights when one of the joint venturers is unable to perform by reason of its financial condition, and apparently imposes a duty on the other joint venturer to pay its unpaid share of profits, JV Agreement ¶¶ 6.2, 6.2.1, but CCI has not argued that this Article applies to the present dispute.

Mr. Timmons acknowledged that neither he nor anyone else on behalf of CCI obtained

WDF's agreement, either written or oral, after the parties' entry into the JV Agreement that

WDF would be directly responsible for paying CCI's overhead and profits for the masonry work

on the Bronx Law Project.  Tr. III at 116; see also id. at 93-94. The only discussions about WDF

being directly responsible for paying CCI on the project for such amounts took place before the

JV Agreement, id., and would appear to be superseded by ¶1.1(c) of the Agreement's integration

clause.

On the other hand, with the exception of the creation of the JV to mollify the SCA and

the actual provisions of the JV Agreement regarding the performance of and payment for the

masonry work, which the parties complied with, the JV had very little, if any, substance.  As

noted, it never entered into and executed the JV Masonry Contract with WDF, notwithstanding ¶

1.1(a) of the JV Agreement.  It does not appear to have filed any organizational documents,

notwithstanding ¶ 1.3 of the JV Agreement, which contemplated the filing of at least a business

certificate, or had any business forms; it did not file any tax returns, consistent with ¶ 1.1(d) of

the JV Agreement, which provides that "each of the parties hereto shall pay its own income

taxes, capital stock, franchise and other similar taxes as if it had performed its aforementioned

pro-rata share in the [JV] independently of the other member of the [JV]."  The JV never

designated a Project Manager, notwithstanding ¶ 5.3 of the JV Agreement; finally,

notwithstanding ¶ 4.3 of the JV Agreement, no bank account was ever opened in the name of the

JV; thus, contrary to ¶ 4.3 of the JV Agreement, no funds were advanced to or by the JV for the

performance of the JV Masonry Contract and no funds were received by it on account of that

Contract for deposit in the JV's name -- instead, WDF made and received all the payments on account of the JV directly.[10] Tr. III. at 21, 142-46.

In furtherance of CCI's argument that the JV was never intended to be a real entity, Mr. Timmons testified that when WDF proposed the concept of performing the masonry work through a JV, WDF's representative referred to it as a "dry" joint venture, which Timmons understood to mean that it would have no real substance.  Id. at 19, 97-98.  On the other hand, although he could not remember the same conversation, Mr. Roman characterized a "dry" joint venture as one to which CCI would not have to make a capital contribution or infuse working capital.  Id. at 143.  The Court found Mr. Roman's testimony more credible.  In any event, it is clear that there was no meeting of the minds on the meaning of a "dry" joint venture in June 2002 -- Mr. Timmons did not share his interpretation at the time with anyone at WDF -- or a waiver at that time or later by WDF of the JV format and the payment terms set forth in the JV Agreement.

At least as importantly, the oral contract that CCI alleges it, rather than the JV, entered into with WDF to perform the masonry work was, as Mr. Timmons acknowledged, on all fours with the JV Masonry Contract contemplated under the JV Agreement to be entered into between WDF and the JV *with the exception of the parties who were to be in privity*.  Id. at 108-110. Mr. Timmons acknowledged that the alleged masonry contract with WDF had exactly the same subject matter and the same payment terms as the JV Masonry Contract.  Id. at 110-11.  Thus, CCI's argument runs counter to the only aspects of the JV that *do* have substance:  the JV's important role in securing the SCA's consent and the subject matter of the JV Masonry Contract,

---

[10] This was, however, somewhat consistent with the last clause of ¶ 4.3 of the JV Agreement, which provides "Withdrawals, transfer of funds and checks shall be made solely upon a signature from a principal of WDF."

as expressed in the JV Agreement, regarding the conduct of the masonry work and the payment terms for such work.

Moreover, as repeatedly brought out on cross-examination of Mr. Timmons, id. at 44-5, 49, 53, 56, 63, 68-9, 74-7, 80, 83 and 84, until the District Court reversed Judge Hardin's ruling because of CCI's fatal lack of privity with WDF in respect of the masonry work, CCI had never alleged a direct contractual relationship with WDF to provide such work.  CCI expressed its previously long held contrary position not only in repeated characterizations of CCI's claim as arising under the JV Agreement, rather than under a direct contract between WDF and CCI, but also in its failure to list any contract between CCI and WDF for the Bronx Law Project masonry work on CCI's schedules submitted under penalty of perjury in this chapter 11 case, to which Mr. Timmons could only lamely respond that CCI's former characterization of the parties' relationship had merely been "the truth as [CCI] understood it then."  Id. at 53; see also id. at 67: "I didn't think it mattered what the lineage was, who did what to who and for why.  We went in there. We did the work and we didn't get paid. . . ."

In sum, therefore, the parties provided for the masonry work on the Bronx Law Project to be performed under a subcontract between WDF and the JV, not between WDF and CCI.  The details of this JV Masonry Contract, although never committed to writing, are not in dispute: CCI's witness confirmed his understanding that they were on the same terms as the alleged oral contract that CCI now contends was made directly between CCI and WDF, with the exception of the parties to the agreements.[11]  The evidence -- primarily the parties' need to use a JV

---

[11] For this reason, CCI's contention that there was a novation of the JV Masonry Contract in favor of a direct WDF/CCI masonry contract (for which there is no credible evidence) is unavailing. Goldbard v. Empire State Mut. Life Ins. Co., 171 N.Y.S.2d 194, 199 (App. Div. 1st Dep't 1958) (for subsequent agreement to supersede prior agreement, intention of the parties to

subcontract structure, the terms of the JV Agreement, the parties' performance of the payment

terms of the JV Agreement, and the absence of any express third-party beneficiary rights of CCI

-- as well as Mr. Timmons' acknowledgement that the only evidence of WDF's affirmative

agreement to a direct WDF/CCI subcontract occurred before the superseding JV Agreement was

executed, establish that there was no direct WDF/CCI subcontract.

**B.      CCI is not a third-party beneficiary of the JV Masonry Contract.**  As

discussed above, ¶ 12.3 of the JV Agreement arguably expressly disclaims any third-party

beneficiary status that CCI, as masonry provider, would have with respect to the subject matter

of the JV Agreement -- the parties' agreement, as joint venturers, that the masonry work on the

Bronx Law Project would be subcontracted between WDF and the JV.  Such a reading precludes

CCI as masonry provider (as opposed to in its capacity as a joint venturer) from being a third-

party beneficiary of not only the JV Agreement but also the JV Masonry Contract provided for

under the JV Agreement.  Nepco Forged Prods., Inc. v. Consolidated Edison Co. of NY, 470

N.Y.S.2d 680, 681 (App. Div. 2d Dep't 1984) ("Where a provision exists in an agreement

expressly negating an intent to permit enforcement by third parties . . . that agreement is

decisive."); Mendel v. Henry Phipps Plaza West, Inc., 789 N.Y.S.2d 885 (1st Dep't 2005), aff'd 6

N.Y.3d 783 (2006).

Even if ¶ 12.3 of the JV Agreement cannot be so read, CCI would not carry its burden,

Strauss v. Belle Realty Co., 469 N.Y.S.2d 948, 950 (App. Div. 2d Dep't 1983), to establish that

it was a third-party beneficiary of the JV Masonry Contract, however.  To succeed under New

York law on a third-party beneficiary theory, a non-party to a contract must be the "intended

beneficiary" of that contract, "not an incidental beneficiary to whom no duty is owed."  Madeira

effect such a substitution, extinguishing the old agreement and replacing it with a valid new one,
must be shown).

18

v. Affordable Hous. Found., Inc., 469 F.3d 219, 251-52 (2d Cir. 2006) (internal quotations

omitted).  Thus, to prevail on a claim for breach of contract as a third-party beneficiary under

New York law, the plaintiff must establish "(1) the existence of a valid and binding contract

between other parties, (2) that the contract was intended for [the plaintiff's] benefit, and (3) that

the benefit to [the plaintiff] is sufficiently immediate, rather than incidental, to indicate the

assumption by the contracting parties of a duty to compensate [the plaintiff] if the benefit is

lost."  Mendel v. Henry Phipps Plaza West, Inc., 6 N.Y.3d 783, 786 (2006) (internal quotations

omitted); see also State of Cal. Pub. Employees' Ret. Sys. v. Shearman & Sterling, 95 N.Y.2d

427, 434-35 (2000).

It is generally recognized that the intent to confer a direct benefit on an unnamed third

party must clearly appear for that party to be a third party beneficiary of a contract between

others.  PT. Bank Mizuho Indon. v. PT. Indah Kiat Pulp & Paper Corp., 808 N.Y.S.2d 72, 73

(App. Div. 1st Dep't 2006) (there must be a "clear intention to confer the benefit of the promised

performance"); Tavella v. Skanska USA, Inc., 902 N.Y.S.2d 328, 332 (Sup. Ct. Kings Cty. 2010)

("It is the generally accepted rule that the intent to confer a direct benefit on a third party must

clearly appear in order to enable such a party, not named in the contract, to recover thereunder.")

(internal quotations and citations omitted).  See also Consol. Edison, Inc. v. Northeast Utils., 426

F.3d 524, 528 (2d Cir. 2005) ("To create a third party right to enforce a contract, the language of

the contract must *clearly* evidence an intent to permit enforcement by the third party.")

(emphasis in original; internal quotations and citation omitted).

There is no requirement that a third party be specifically mentioned in the contract, or

even identifiable when the contract was made, to acquire third-party beneficiary status under it.

Strauss v. Belle Realty, 469 N.Y.S.2d at 950.  However, the parties' intent to benefit the third

party "must be shown on the face of the agreement." Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 663 (2d Cir. 1996) (internal quotations and citations omitted); see also IMS Engineers-Architects, P.C. v. State of New York, 858 N.YS.2d at 488 (contracts to be construed by their plain meaning; nothing in construction contact evinces an intent to benefit second-party subcontractor beyond its status as incidental beneficiary); Consol. Edison, Inc. v. Northeast Utils., 426 F.3d at 528.

As noted above, a subcontractor generally may not assert a cause of action for breach of contract against one with whom it is not in privity. Cavalry Constr. Inc. v. WDF, Inc., 428 B.R. at 30. This approach applies to third-party beneficiary rights, also. Port Chester Electrical Constr. Corp. v. Atlas, 40 N.Y.2d 652, 656 (1976) ("Generally it has been held that the ordinary construction contract -- i.e., one which does not expressly state that the intention of the contracting parties is to benefit a third party -- does not give third parties who contract with the promisee the right to enforce the latter's contract with another. Such third parties are generally considered mere incidental beneficiaries."); Palermo Mason Constr. v. Aark Holding Corp., 752 N.Y.S.2d 99, 100 (App. Div. 2d Dep't 2002); E & M Hardwood Flooring Corp. v. Chlupsa, 687 N.Y.S.2d 870, 870-71 (App. Div. 2d Dep't 1999).[12]

---

[12] Cf. Logan-Baldwin v. L.S.M. Gen. Contrs., Inc., 942 N.Y.S.2d 718, 721 (App. Div. 4th Dep't 2012) (summary judgment denied where *owners* asserted third-party beneficiary claim against second-tier contractor for defective work); R.H. Sanbar Projects, Inc. v. Gruzen Partnership, 538 N.Y.S.2d 532, 534 (App. Div. 1st Dep't 1989) (same), which also could be read consistently with the "functional equivalent of privity" doctrine. As discussed above, that narrow and fact-specific doctrine might prove an exception to the general rule requiring privity, also, under the right circumstances, but CCI did not establish them, and even when invited by the Court to provide supplemental briefing on the issue, in light of the facts brought out at the third trial, Tr. III at 152, CCI declined to do so. In addition, the record after the third trial is not materially more developed for purposes of applying the functional equivalent of privity doctrine than the record after the second trial, and, under the law of the case, and absent WDF's actual or implied consent, which is absent here, CCI therefore may not conform its pleadings to the proof to establish the functional equivalent of privity. Before and during the trial, WDF did not have the

CCI has pointed to no evidence establishing that it was the intended beneficiary of the JV Masonry Contract; indeed, such an assertion contradicts the structure agreed to by the parties under the JV Agreement, pursuant to which CCI would be paid its profit solely from the profits of the JV on a 50/50 basis with WDF.  Accordingly, it has not carried its burden to show that it was a third-party beneficiary of the JV Masonry Agreement with standing to bring a contract claim against WDF.

C.    **The JV was not void ab initio**. Finally, CCI asserts that the JV was not a "true joint venture"[13] and, therefore was void ab initio. The facts belie this contention.

"The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for sharing of profits and losses." Richbell Info. Servs. v. Jupiter Partners, L.P., 765 N.Y.S.2d 575, 584 (App. Div. 1st Dep't 2003); see also Brown v. Cara, 420 F.3d 148, 159-60 (2d Cir. 2005) (same); Kaufman v. Torkan, 859 N.Y.S.2d 253, 255 (2d Dep't 2008) (same). The same factors were expressed, albeit somewhat differently by the court in Kidz Cloz, Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004):

> [A] plaintiff pleading the existence of a joint venture must establish that:  (1) two or more parties entered an agreement to create an enterprise for profit, (2) the agreement evidences the parties' mutual intent to be joint venturers, (3) each party contributed property, financing, skill, knowledge, or effort to the venture, (4) each party had some degree of joint management control over the venture, and (5) there was a provision for the sharing of both losses and profits.

opportunity to present a full case dealing with the doctrine, which CCI appeared to have abandoned. New York State Elec. & Gas Corp. v. Sec'y of Labor, 88 F.3d 98 104-05 (2d Cir. 1996).

[13] CCI never asserted that the veil between the JV and WDF should be pierced.

Each of these factors was present for the JV. Clearly WDF and CCI agreed to form the JV, doing so pursuant to the JV Agreement, with the intention of mollifying the SCA about CCI's financial condition and in recognition of WDF's role in primarily financing the masonry work. WDF and CCI undertook in the JV Agreement to share profits and losses on the JV Masonry Contract, the sole purpose of the JV. JV Agreement ¶¶ 3.1, 3.5. Relatedly, as discussed supra, the parties eschewed aspects of their more normal contractor/subcontractor relationship; for example, WDF advanced funds to pay "Costs of Construction" before receiving them from Silverite and did not withhold retainage in respect of such payments, WDF did not require a bond, WDF had the right to approve in advance most expenditures and Costs of Construction on the masonry work, and CCI's two principals were not to be paid except by CCI from its share of the profits of the JV.

Each party also contributed a combination of property, financing, skill, knowledge and/or effort to the JV. Although WDF provided most of the financing, CCI was financially responsible for its two principals (Mr. Timmons and Mr. Shannon, each of whom worked a substantial amount of their time on the project, Tr. III at 87) and corporate overhead, which would not get paid except from the profits of the JV. Id.; JV Agreement ¶¶ 3.2; 3.4. JV Agreement ¶ 3.2 also provides that "It is anticipated that each Joint Venturer will supply a reasonable level of management and administrative time to the Project, including the time of K. Timmons, D. Shannon, J. Stacom, and J. McQuade, in the supervision of the Project." See also id. at ¶ 5.1(a) ("Each Joint Venturer hereby agrees to appoint two representatives to act on such Joint Venturer's behalf in carrying out the Joint Venture's business.") and ¶ 5.1(c)(ii) (designating Messrs. Timmons and Shannon as CCI's representatives). Finally, CCI was intended to provide

22

the work, labor, tools and equipment, and "shall assume primary day-to-day responsibility to administer, manage and perform all masonry-related functions in the [JV Masonry Contract]." Id. at ¶ 5.5.

It is true that under the JV Agreement, WDF was declared the Managing Joint Venturer ("MJV") and, as such "[a]ll decisions, commitments, agreements, undertakings, understandings, or other matters pertaining to the performance of the Project shall be within the full and exclusive control of the MJV." Id. at ¶ 5.2. However, CCI goes too far when it argues that this provision, and the actual conduct of the JV, deprived CCI of all control over the JV and thus rendered it not a joint venture in fact. First, ¶ 5.2 of the JV Agreement is belied by JV Agreement ¶¶ 3.2, 5.1 and 5.5, cited above, which give CCI a substantial measure of control over the JV, albeit over its day-to-day operations. Second, it is clear that joint venturers need not have complete equality as to every element, including control, of a joint venture under the authorities quoted above, which refer to each joint venturer having "a measure" or "some degree" of control. Brown v. Cara, 420 F.3d at 160; Kaufman v. Torkan, 859 N.Y.S.2d at 255; Kidz Cloz, 320 F. Supp. 2d at 171. See also Richbell Info. Servs., Inc. v. Jupiter Partners, 765 N.Y.S.2d at 585 ("[I]t is not required that each joint venturer actually exercise the same degree of management control. . . . The inquiry as to the existence of this factor is limited to whether a member of the venture had *any* measure of control.") (emphasis in original); Sterling v. Sterling, 800 N.Y.S.2d 463, 465 (App. Div. 3d Dep't 2005) (partnership found; "although defendant had a greater role in its management and day-to-day operations, decisions regarding its structural improvements were made by both of them.").

CCI's authorities are distinguishable. See, e.g., Village of Wellsville v. Village of Andover, 647 N.Y.S.2d 606, 607 (App. Div. 4th Dep't 1996) (one party remained in "total

control of the operation and management" of the alleged joint venture, there was no indication in the parties' agreements that they intended to form a joint venture, and there was no indication of an agreement to share losses); Kellogg v. Kellogg, 585 N.Y.S.2d 824, 825 (App. Div. 3d Dep't 1992) (evidence that agreement left total control in one person, stated that its primary purpose was to protect the parties in case of the death or disability of the other, and did not provide for a sharing of losses, as well as testimony that agreement was intended for security, supports finding that agreement was not a partnership agreement, but, rather, a security agreement); De Vito v. Pokoik, 540 N.Y.S.2d 858, 859 (App. Div. 2d Dep't 1989) (alleged joint venturer "contributed no cash to the company, did not hold himself out as a joint venturer, possessed no management responsibilities, and was not held personally liable for any of the business obligations.").

### Conclusion

For the foregoing reasons, judgment shall be granted in favor of WDF on all remaining claims asserted against it in respect of the Bronx Law Project.  WDF shall email a proposed judgment to chambers, with a copy to counsel to CCI, consistent with the foregoing

Dated:  White Plains, New York
        October 18, 2013

                                        /s/Robert D. Drain_____
                                        Robert D. Drain
                                        United States Bankruptcy Judge